Mr. Chief Justice Shakkey
delivered the opinion of the court.
The object of the bill is to subject certain slaves therein mentioned to the payment of the debts of the complainants. The case was before this court on a former occasion, and is reported in 1 S. & M. 423, to which we refer for the facts. On demurrer to the bill the case was held to be a proper one for relief in chancery. There is, therefore, no question of law now involved, but a question of fact only, which arises out of the answers which were filed after the case was remanded. The complainants seek to enforce claims against Reizen R. Chilton, but he disclaims the property in his answer, and says that it belongs to his co-defendant, Pelatiah Chilton, who, in his answer, asserts his claim. It is admitted by the answers that the negroes were sold by Pelatiah to Reizen R. in 1840; that they continued to be his property up to the 2d of May, 1842, when they were resold to Pelatiah. The bill of sale of the 2d of May, 1842, is introduced a.s evidence of this sale; Rut on the other side, it is contended that this sale was made to defraud creditors, and is therefore void, and the only question is, was this sale fraudulent ? This question depends alone on the weight of the evidence.
Pelatiah Chilton has introduced an apparent title, to overcome which it is incumbent on the complainants to establish that it was made to defraud creditors. A great number of witnesses have been examined on both sides, and the testimony is so contradictory as to defy reconciliation. There seems to be no alternative but to discredit some of the witnesses. In this conflict of testimony, the safest reliance seems to be on the force of certain leading circumstances or facts which seem to be well established.
There is one important fact about which there seems to be but little serious contradiction. It is this: the negroes remained in possession of Reizen R. Chilton until they were taken from Alabama about the first of July, 1842, although he had convey-them to his father, Pelatiah, on the 2d of May. This fact is established by the testimony of Walker, Fullingham, and Baker, the overseer. And even Reizen himself says they were left on *390 the place. His place was about three miles distant from his father’s. It is immaterial whether he claimed them or not. To disclaim them under the circumstances was in no way calcu-. lated to weaken the presumption of fraud. If a fraud was intended by the bill of sale to his father, it was to be expected that he would endeavor to produce the impression that the transaction was a fair one, by disclaiming the property. None of the witnesses disprove this fact of possession. Whilst some of them may say that they regarded the property as belonging to Pelatiah Chilton after the 2d of May, 1842, yet none of them speak of an actual change of possession. To permit it to remain in the possession of Reizen R. made the transaction prima facie fraudulent, and the burthen of proof is thrown back upon Pelatiah; he must prove that it was bona fide.
The next important circumstance is, that the negroes were very suddenly, and, if we believe some of the witnesses, clandestinely removed from Alabama. That seems to have become rather a matter of public notoriety; so much so, that many of the witnesses speak of the negroes as having been t! run oif.” In this connection it is important to notice the testimony of William Fullingham. Reizen R. Chilton had called at his house to see witness, as he was informed, whereupon he went to Reizen R. .Chilton’s house; found Asahel Chilton, Pelatiah, and Reizen all there. Reizen addressed him, saying, we have a family of negroes here, and there are some old debts against them; we want you to put them out of the way; they asked him to start next morning, to which, after some hesitation, he consented. According to directions he went down the road leading south from the county, about four miles from Reizen’s house, and then waited until the negroes were brought to him through the woods by Baker (the overseer of Reizen R. Chilton,) and Pelatiah Chilton. Baker told him to take the negroes to a man named King, in Barbour county, near two hundred miles oif. Pelatiah gave him instructions as to the road, and told him to go pretty fast. This was on the 1st of July, 1842. The witness took the negroes to King, and gave him a letter which Reizen R. Chilton had handed witness the morning he received the negroes, which *391 letter instructed King to take charge of the negroes, until further orders. This witness’s testimony in this particular is not contradicted, nor is his credibility impeached. He was subsequently examined by defendants, but he does not give a contrary statement. He merely explains a part of his former testimony. His testimony is corroborated by Baker, who says the negroes were “run off” about the 1st of July, 1842, to avoid certain judgments against Reizen R. Chilton, to the best of his recollection the judgments of complainants. Nor do the defendants pretend to controvert the statement of this witness (Fullingham) as to the time and manner of taking off the negroes by any question asked Reizen R. Chilton, who, in fact, corroborates the witness, by saying that he took off the negroes. We must regard the fact as established then, that the negroes were suddenly and rather secretly taken off. This is a suspicious circumstance, and, unexplained, is calculated to operate against the claim of Pelatiah. If he had made a bona fide purchase, why should he wish to remove the negroes? Honesty requires no stratagem or subterfuge to support and aid it. It was, therefore, incumbent on Pelatiah to explain this suspicious circumstance, in order to repel its influence. The prima facie case of fraud, then, arising from Reizen R. Chilton’s holding possession, is strengthened by the circumstance of this sudden removal, and both must be accounted for, in order to remove suspicion; but before we proceed to the explanation, it is to be borne in mind, that the next day after the five negroes were taken off by Ful-lingham, to wit, on the 2d day of July, two others were started to Marshall county, in this state, a distance of three hundred miles, in charge of Asahel Chilton, where they were placed in possession of the defendant Rayford.
To proceed then to the grounds relied upon to rebut these presumptions, and this will lead us somewhat into detail. It would seem that these negroes had originally belonged to Pelatiah Chilton. Pie had become involved, by being security in a guardian’s bond for one Barr. To secure this debt, he executed twelve promissory notes, dated in 1839, payable in one, two, and three years. To secure their payment, he also gave a deed *392 of trust on bis land. This debt was between five and six thousand'dollars, but Reizen R. Chilton, afterwards married one of the wards to whom the debt was due. In 1840, Pelatiah sold the negroes to Reizen R., and made a bill of sale, which was regularly proven and recorded, although this was unnecessary by the laws of Alabama. The consideration expressed in the bill of sale is fifty-three hundred dollars, though it is said the true and only consideration was the agreement of Reizen R. Chilton to pay the debt for which the deed of trust was given; and to that end he executed a penal bond, bearing even date with the bill of sale, in the penalty of twelve thousand dollars, conditioned to pay the debt. This bill of sale was witnessed by Baker, who says, that both parties stated to him that it was a fair transaction. Reizen R., it is alleged, failed to pay the debt, except that portion which was coming to, him by his marriage with one of the two young ladies to whom the debt was due; and the trustee was about proceeding to sell. And as he had failed to pay the debt, he re-conveyed the remainder of the ne-groes, having sold a sufficient number to satisfy his own portion of the debt; and this is the bill of sale which was made on the 2d of May, 1842, which is said to be fraudulent. The consideration expressed in the bill of sale is $2600, though it is said the true consideration was as above stated.
Both Reizen R. and Asahel Chilton testified in the most positive manner that -this last sale was bona fide; that the negroes were conveyed because Reizen R. had failed to pay the debt which he had agreed to pay, as the original consideration which he had agreed to give. There are many circumstances disclosed in the course of the testimony which operate powerfully against this statement, and they seem to be so conclusive, that it is difficult to resist their force. Reizen R. was very much embarrassed, indeed insolvent. Two cases against him had been taken to the supreme court of Alabama, and this bill of sale was made but a short time before the judgments were affirmed. The witness, Baker, states that the negroes were run off to avoid the judgments of complainants, which were the cases that had been taken to the supreme,court. If the sale had been bona fide, this *393 was unnecessary, as they were not liable in the hands of Pela-tiah for Reizen R. Chilton’s debts. Walker had a conversation with Reizen R. about July, 1842, and he did not then mention the sale to his father, although this conversation was held in reference to the negroes. A rumor, it seems, was in circulation that he would run his negroes; this was mentioned by Walker to him, when he said he would not, but would let them remain to pay his debts. If he had really sold them to his father, it is remarkable that he did not, under the circumstances, so state to Walker. This conversation was probably in June, as the witness says it v/as but a few days before they were run. Then his declarations to Fullingham, which were made in presence of Pelatiah Chilton, in which he said, We have a family of negroes here, and there are some old debts against them. Why should he have been so much interested in running the negroes of Pela-tiah Chilton 1 They were not liable for his debts. And when this remark was made, Pelatiah did not assert a claim to them.
In the next place we come to the testimony of Willis. His credibility was attacked by eight witnesses, who swore that they would not believe him. But ten others, (perhaps eleven,) swore they would believe him, and one of them was a witness introduced by defendant to impeach his credibility. By some of the witnesses he is spoken of in high terms of commendation as a man of integrity. Every presumption is in favor of the credibility of a witness, and although there is impeaching testimony, yet it is overbalanced. Under such circumstances we cannot reject it. But apart from the support which is given to it by the sustaining witnesses, the statements of the witness are, in several particulars, corroborated. Willis says that he heard both of the Chiltons say the negroes had been run off to avoid these debts. Both Fullingham and Baker corroborate this statement. The witness also testified that they said the cases had been taken to the supreme court, expecting to reverse them, and their security need not be uneasy. This witness also testifies that the negroes were in possession of Reizen R. Chilton until *394 they were run off. This conduct and these declarations are wholly inconsistent with a bona, fide sale.
But the ground of doubt is not confined to this sale of the 2d of May, 1842. In all probability, the sale from Pelatiah to Reizen in 1840 was but a device. If this be so, then, there was evidently no consideration for the sale in 1842, which is made to rest upon the previous sale. What is stated to have been the consideration for the sale of 1840 ? That Reizen R. should pay the debt secured by the deed of trust. The first thing calculated to throw a suspicion over this transaction is the manner in which the bill of sale was executed, and the declarations of the parties at the time the contract was made. It was duly proven by the subscribing witness, and recorded. This was not necessary, and looks as though it might have been done for effect, to give the semblance of open reality to that which was fictitious. But both parties stated to the witness that it was a fair sale. Why should such a .statement have been made 1 Certainly men who were making a fair and valid sale, would hardly think it necessary to say so to a witness. They might have stated the consideration to him, but when they assure him that it is fair, it is calculated to give rise to a suspicion that it is not so. When the part is over-acted, the delusion is broken and the fiction appears.
But again, it seems that Pelatiah Chilton was very much embarrassed, and an execution was levied on one of these same negroes as his property in 1842, which being claimed by Reizen R., Pelatiah Chilton was introduced on the trial to prove his right. What he said on that occasion is variously reported. Most of the witnesses concur in saying that he swore he had sold the negroes to Reizen R., who' had paid for them by paying a debt in Georgia of $3000, and a debt due to a bank in Alabama and some other debts. This is the testimony of Wiley and Crow. Martin says .he swore that the consideration was sums of money paid and services. Walker says that he enumerated the debts which Reizen had paid for him, but the witness did not recollect them. Other witnesses speak of his swearing that a debt in Georgia was paid. It is said by other witnesses *395 that the debt paid in Georgia was $700, and the debt to the bank $400. This- much seems to be certain, that he did say something about Reizen’s having paid something in Georgia, and other debts and sums of money for him, as the consideration. If this be so, the consideration was not Reizen’s agreement to pay the debt secured by the deed of trust and the bill of sale; and especially the penal bond, are not what they profess t,o be. Reizen told Parks that he had paid for the negroes in cash. He told another witness that he was security for his father, and had to take them to save himself. In his own testimony he stated that for the debt he paid in Georgia. ($700), and the bank debt, his father had given him land. How, then, did his father happen to mention these debts? According to his statement, they seem to have no connection with the contract for the negroes. But it seems the jury did not believe Pelatiah, and the property was subjected to the execution against him.
We have given much weight to the manner of running off the negroes, as a circumstance tending to show the fraudulent character of the bill of sale of the 2d of May, 1842. «The excuse set up for having done so is, that the object was to raise money to redeem the land. That is the reason set forth in the answer, and by the witnesses Asahel and Reizen R. Chilton. If the evidence sustained the respondent in this position, the excuse might be deemed sufficient as to every thing but the manner of sending them off. But let us examine the facts. The negroes were started on the 1st and 2d of July, 1842. The land was sold on the 12th of the same month, and we must suppose it had been advertised beforehand. Part of the negroes were started to Barbour county in Alabama, two hundred miles off, to be placed in the care of a Mr. King, not to sell, but to keep theta until further orders. Strange, indeed, that negroes should be sent to such a distance, when the money was wanting in ten days. But it must be kept in mind that neither Fullingham nor King was then authorized to sell. Fullingham returned, and for some reason or other was sent back to take the negroes to Georgia, and then it was that he received the power of attorney to sell, which is dated the 24th of July, twelve days after *396 the land had been sold. Under this power of attorney, he took the negroes to Georgia, and, failing to sell, left them there. Reizen R. Chilton was sent after them, not to take them back to Benton county, Alabama, but to bring them to Mississippi. Whether he came through or round Alabama does not appear. Then with reference to the negroes sent to Marshall county, it was impossible, in the nature of things, that they could be taken three hundred miles, and sold in time to have the money in Alabama in ten days, a distance of three hundred miles. But there is another reason given for sending the negroes to Georgia and Mississippi, which is no less striking. The beneficiary ir the deed of trust would take nothing but gold or silver coin, which was very scarce in Alabama. Was it more abundant in Mississippi ? The testimony does not inform us, but if we may be permitted to speak of a fact of public notoriety, Ave should' say that it was quite as scarce here as in any other state. The negroes were ultimately all brought to Mississippi, and as a very conclusive proof that they were not brought here to raise money for a pressing emergency, two of them were sold by Pelatiah Chilton, after he came on, to Rayford, on a credit. The excuse then given for removing the negroes from Alabama makes the matter worse. The circumstances prove it to be a false one. But if the object was to raise money to redeem the land, why were the negroes taken off in the manner they were ? Why first sent to Barbour county, to be placed with King, without authority to sell them? And why send part to Barbour county and part to Mississippi ? The declaration of Pelatiah Chilton to Fullingham, after he returned from the first expedition, is remarkable, and accounts for the removal of the negroes to Georgia, with authority to sell. He stated that the property left in Benton county was levied on by Parks, Selman, Mc-Campbell, and others, and he was afraid it would be found out Avhere the negroes were that the witness had carried off; he wished the witness to get them and take them to Georgia and sell them; and insisted on ,the witness starting that night. The second expedition was thus got up. The witness went with Pelatiah to Reizen’s house, and received from the latter the *397 power of attorney. It will be observed that, throughout, both the Chiltons seem to have been principal actors in the scheme. It is thus rendered. perfectly certain that the negroes were run off for the purpose of avoiding debts, either of the one or the other, and they are so connected in the transaction that it is impossible to separate them. Both are implicated, but the debts of Reizen seem to have been the great moving cause. We have said it was incumbent on Pelatiah Chilton to rebüt the presumption of fraud arising from the possession of Reizen. This he has not done satisfactorily. After reading the evidence with great care, it certainly falls short of satisfying the mind that no fraud was intended. That fraud in some shape or other was contemplated by both parties throughout the whole transaction, from 1840 up, is doubtless true. There are too many circumstances inconsistent with entire fairness. The witness, Reizen R. Chilton, may have thought it all fair, but the utmost reliance cannot be placed on his testimony. He was a party to the transaction, and confessed that he felt a great desire that his father should succeed in this suit, although he had no interest in the subject matter of the suit. And besides it is inconsistent with his former statements. Our conclusion is, that the sale from Reizen R. to Pelatiah was fraudulent as to creditors.
The question now arises, what decree shall be given 1 We can do nothing more than remand the cause. The complainants seem to have proceeded on the notion, that in their judgments recovered in Alabama they held a lien, and have not shaped the prayer of the bill so as to accomplish any thing more than a sale of this property. They must amend their bill so as first to get a decree for their debt, and for this reason the decree cannot be made final here.
There is a point, too, which strikes us as important, that -has been overlooked by counsel. Reizen R. Chilton is a bankrupt. How are the complainants to enforce their claim against him I They have no lien in this state to protect them. We suggest this point as worthy of consideration. Indeed, it seems to present a great obstacle in the way of the complainants’ success.
Decree reversed and cause remanded.